**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANGEL LUIS VELEZ SANTIAGO,<br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br>    Defendant. | CIVIL ACTION NO.<br>3:16-cv-338 (JCH)<br><br><br>FEBRUARY 15, 2017 |

**RULING RE: CROSS MOTIONS FOR JUDGMENT ON THE PLEADINGS (Doc. No. 16) AND TO AFFIRM THE DECISION OF THE COMMISSIONER (Doc. No. 20)**

## I.    INTRODUCTION

The plaintiff, Angel Luis Velez Santiago ("Velez"), filed this administrative appeal pursuant to section 405(g) of title 42 of the United States Code.  See Complaint (Doc. No. 1) ¶ 1.  Velez asks this court to reverse the final decision of the Commissioner of Social Security, defendant Carolyn W. Colvin ("Colvin"), which denied Velez's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  See Compl. ¶¶ 12–13, Prayer for Relief; see also Mot. for J. (Doc. No. 16).  Velez argues that (1) the Administrative Law Judge (ALJ) afforded insufficient weight to the opinion of Velez's treating physician, and (2) the ALJ improperly evaluated Velez's credibility.  See Mem. in Supp. of Mot. for J. (Doc. No. 17) at 1, 6.  Colvin moves the court to affirm the final decision.  See Mot. to Affirm (Doc. No. 20).

For the reasons that follow, the court **GRANTS** Velez's Motion for Judgment on the Pleadings (Doc. No. 16), **DENIES** Colvin's Motion to Affirm (Doc. No. 20), and **REMANDS** this case to the agency for proceedings consistent with this Ruling.

## II.    MEDICAL BACKGROUND[1]

Velez was born in 1959.  See Certified Transcript of the Record ("Tr.") (Docs. No. 12-3 to 12-9) at 135.  He has a seventh grade education.  See id. at 137.  In the past, he worked as a firefighting equipment tender, a landscape laborer, and a commercial cleaner.  See id. at 159.

### A.    Dr. Khalid's Notes

Velez's treating physician is Dr. Haroon Khalid, M.D. ("Dr. Khalid"), at Southwest Community Health Center.  Dr. Khalid's treatment notes[2] state, inter alia, the following:

On June 2, 2009, Velez complained of wrist pain, radiating to his left shoulder. See id. at 567.  The pain was at an intensity level of six out of ten.  See id. at 567.  Dr. Khalid diagnosed Velez with wrist and shoulder pain, and also recorded diagnoses of anxiety and hypertension.  See id. at 567.  Dr. Khalid's notes from subsequent office visits reflect ongoing diagnoses of anxiety and hypertension.  See id. at 521–61, 735– 62.  On August 17, 2009, Velez no longer had wrist pain.  See id. at 566.  On October

---

[1] The court takes the medical background from the Certified Transcript of the Record ("Tr.") (Docs. No. 12-3 to 12-9) and the Plaintiff's Statement of Facts (Doc. No. 18).  The court had ordered the parties to "make a good faith attempt to stipulate to the facts."  Scheduling Order (Doc. No. 13).  Velez's attorney has represented that he emailed a proposed stipulation to one of Colvin's attorneys nineteen days before the due date, but that Colvin's attorney advised him, on the due date, that she had not yet reviewed his proposal.  See Mot. for Extension (Doc. No. 14).  Velez's attorney thus filed a Motion for Extension of Time, see id., which the court granted, see Endorsement Order (Doc. No. 15).  Velez's attorney has also represented that Colvin's attorney then told him that she would not revise his proposed stipulation because she would be on vacation at the time of the new due date.  See Pl.'s Statement of Facts at 2.

The court had further ordered that, "[i]n the event that a stipulation of facts cannot be reached, Plaintiff's memorandum shall contain a medical chronology, in narrative form, with record citations, to which Defendant shall respond, either agreeing with the chronology as presented or indicating any material omissions or areas of disagreement, again with record citations."  Scheduling Order.  Velez's attorney thus supplied the court with the Plaintiff's Statement of Facts.  See Pl.'s Statement of Facts. Colvin's attorney, however, has failed to respond to the Statement of Facts as ordered.

[2] Some of Dr. Khalid's notes contain a signature, rather than his full name.  See Tr. at 548–60. Dr. Khalid's identity can be recognized by comparing these signatures to the signature that accompanies Dr. Khalid's name on the February 27, 2015 Physical Therapy Adult Evaluation.  See id. at 728.

27, 2009, however, Velez complained of severe pain in his arm, which had lasted three weeks. See id. at 565. The pain was at an intensity level of ten out of ten. See id. at 565. Dr. Khalid diagnosed shoulder pain. See id. at 565. On January 27, 2010, Velez complained of chest pain, shoulder discomfort, and finger numbness. See id. at 564. Velez's pain was at an intensity level of three out of ten. See id. at 562. Dr. Khalid diagnosed chest pain. See id.at 562. On March 29, 2010, Velez had no pain. See id. at 563.

On October 27, 2010, Velez complained of depression, anxiety, and stress. See id. at 559. His mother had died a month before. See id. at 559. Dr. Khalid diagnosed depression. See id. at 559. Dr. Khalid's notes from subsequent office visits reflect an ongoing diagnosis of depression. See id. at 521–55, 735–61.

On January 27, 2011, Velez complained of back pain and muscle stiffness. See id. at 558. Dr. Khalid diagnosed back pain. See id. at 558. On July 12, 2011, Velez complained of chest pain, radiating to his right shoulder and the right side of his back. See id. at 556. The pain had lasted for a week and was at an intensity level of seven out of ten. See id. at 556. Velez also was experiencing neck stiffness. See id. at 556. Dr. Khalid diagnosed neck and shoulder pain. See id. at 556.

On September 12, 2011, Velez reported depression and suicidal thoughts as a result of his son's recent death, but he was not in physical pain. See id. at 555.

On October 3, 2011, Velez reported a recent work injury to his back, and his back pain was of an intensity level of five or six out of ten. See id. at 554. Velez continued to complain of depression. See id. at 554. Dr. Khalid again diagnosed back pain. See id. at 554. Dr. Khalid's notes from subsequent office visits reflect this

3

diagnosis.  See id. at 521–53, 735–62.  On December 2, 2011, Velez was experiencing chronic back pain with an intensity level of six or seven out of ten, and also complained of anxiety.  See id. at 553.  On February 2, 2012, Velez stated that he was trying to cope with depression.  See id. at 552.  Velez also had chronic back pain with an intensity level of three out of ten, and an MRI reported a bulging disc.  See id. at 552. On May 2, 2012, Velez presented with anxiety and depression, stating that at times, he was unable to get out of bed.  See id. at 551.  He also complained of chronic back pain, at an intensity level of three out of ten.  See id. at 551.

On August 29, 2012, Velez presented with right knee pain, which had caused him difficulty walking for the past month, despite Velez not having experienced trauma to the area.  See id. at 550.  Velez also continued to complain of anxiety.  See id. at 550.  Dr. Khalid diagnosed knee pain.  See id. at 550.

On May 6, 2013, Velez experienced back pain at an intensity level of seven out of ten, which was aggravated by bending and twisting.  See id. at 544–46.  Velez's extremities, however, had a "[n]ormal range of motion, muscle strength, and stability [ ] with no pain on inspection."  Id. at 546.

On September 3, 2013, Velez was not in pain and again had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection."  Id. at 540–42.  Velez was experiencing occasional symptoms of anxiety, however.  See id. at 540.  On December 3, 2013, Velez felt "increasingly depressed and anxious."  See id. at 536.  Velez still was not in pain, and still had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection," except that Velez experienced mild pain when he moved his right hand's middle finger.  Id. at 536–38.  On

December 10, 2013, Velez was not in pain, and had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." Id. at 533.

On February 3, 2014, Velez's back pain was "worsening," however, and occurred "persistently." Id. at 526. Velez described "the pain as an ache, discomforting, piercing, sharp and stabbing." Id. at 526. Velez's symptoms were "aggravated by bending, changing positions, daily activities, lying/rest, sitting and standing." Id. at 526. The back pain once again was at an intensity level of seven out of ten. See id. at 528. Velez also complained of "anxiety and depression." Id. at 526.

On March 10, 2014, Velez was no longer in pain, and once again had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." Id. at 522–23.

On May 9, 2014, however, Velez presented with "bilateral pain and swelling on both legs and hands," which had lasted for the past three weeks. Id. at 735. Velez had "no strength" in his hands—he could not even "hold a gallon of milk." Id. at 735. Velez also complained of pain on the right side of his head. See id. at 735. Confusingly, however, Dr. Khalid noted that Velez had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." See id. at 737.

On June 20, 2014, pain persisted in Velez's back, right foot, and hand. See id. at 740. Velez experienced "moderate pain" when he moved his spine. See id. at 742. Additionally, Velez's middle finger on his right hand was "lock[ing] up." Id. at 742. On August 19, 2014, Velez complained that his right foot hurt when he walked. See id. at 745. Velez had experienced this foot problem for the last two weeks. See id. at 745. Velez felt mild pain when he moved his right foot or ankle. See id. at 747.

On October 14, 2014, and again on January 6, 2015, Velez no longer had any pain, and a physical examination of all four of Velez's extremities produced normal results.  See id. at 752, 758.

On February 3, 2015, however, Velez had back pain with a severity level of eight out of ten.  See id. at 761, 764.  The problem fluctuated, but occurred persistently.  See id. at 761.  Velez described "the pain as an ache and throbbing."  Id. at 761.  Symptoms were "aggravated by bending, changing positions and lifting."  Id. at 761.  The pain had lasted for the past two to three days.  See id. at 761.  Velez also complained of "shoulder pain, difficulty making a fist [with his] left hand after surgery for [his] trigger finger, feel[ing] depressed, [and being] unable to work and be gainfully employed."  Id. at 761.  Velez experienced moderate pain when he moved his lumbar spine, and had a mildly reduced range of motion in his shoulders.  See id. at 764.

Dr. Khalid's treatment notes state that Velez's "[p]rimary language is English," id. at 526, 531, 536, 540, 544, but that his "[l]anguage spoken at home is [Castilian] Spanish," id. at 526.

B.    Dr. Goccia's Opinion

On January 15, 2014, Dr. Richard Goccia, MD ("Dr. Goccia") examined Velez, at the request of the Social Security Administration (SSA).  See id. at 516–20.  Dr. Goccia wrote that "[t]he claimant states that when he bends his knees far, they crack and are sore, the right more than the left.  This has been going on for many years."  Id. at 516. Dr. Goccia also wrote that, "[t]he claimant does his cooking, cleaning, laundry, and shopping.  He is able to shower and dress himself."  Id. at 517.  Dr. Goccia described Velez as appearing "to be in no acute distress."  Id. at 518.  Dr. Goccia stated that Velez

had a normal gait, could walk on his heels and toes "without difficulty," could squat fully, had a normal stance, "[u]sed no assistive devices," and was "[a]ble to rise from [a] chair without difficulty."  Id. at 518.

Dr. Goccia described the results of a musculoskeletal exam by stating, inter alia, that Velez's cervical and lumbar spine both showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally," and that Velez had a full range of motion, bilaterally, in his shoulders, elbows, forearms, wrists, hips, knees, and ankles. Id. at 518.

Dr. Goccia also stated that Velez had a strength level of five-out-of-five in his "upper and lower extremities," that his "[h]and and finger dexterity" was "intact," and that he had a grip strength level of five-out-of-five, bilaterally.  Id. at 519.

Dr. Goccia diagnosed Velez with conditions including lower back pain, depression, and anxiety.  Id. at 519.  Dr. Goccia also stated that Velez "is without limitations.  However, he should be restricted from more than moderate exertion given his cardiac history."  Id. at 519.

  C.    Dr. Khalid's Opinion

On February 4, 2015, Dr. Khalid filled out a Disability Impairment Questionnaire regarding Velez.  See id. at 643.  Dr. Khalid diagnosed Velez with back pain, shoulder pain, sleep apnea, artery disease, hypertension, depression, anxiety, and diabetes. See id. at 643.  Dr. Khalid noted that these diagnoses were supported by the following clinical and laboratory findings: (1) limited and partial range of motion in Velez's shoulders, (2) painful and decreased flexion in Velez's spine, (3) tiredness, (4) feeling of depression, and (5) the results of an x-ray of Velez's spine.  See id. at 643.  Dr. Khalid

noted that Velez is not "a malingerer."  Id. at 643.  Dr. Khalid listed Velez's "primary symptoms" as chronic back pain, bilateral shoulder pain, anxiety, and depression.  See id. at 644.  Dr. Khalid described the pain as "dull, aching," and stated that precipitating or aggravating factors included bending, prolonged standing, and lifting.  See id. at 644.  The doctor listed the medications prescribed to Velez as including, inter alia, Tramadol, Meloxicam, Xanax, Lovastatin, Metformin, Glimepiride, Cymbalta, and Ambien.  See id. at 644.

Dr. Khalid estimated that, in an eight-hour workday, Velez could perform one hour of seated work, and less than one hour of work that involves standing, walking, or both.  See id. at 645.  Dr. Khalid indicated that Velez could "[o]ccasionally" lift or carry up to ten pounds, but not more.  Id. at 645.  Dr. Khalid also indicated that Velez can "[n]ever," or "[r]arely," reach overhead; and can only "[o]ccasionally" grab, turn, or twist objects, or use his hands or fingers for fine manipulations.  Id. at 646.

## III.    PROCEDURAL HISTORY

On November 14, 2013, Velez applied for DIB and SSI benefits, for an alleged disability beginning August 22, 2011.  See id. at 322, 326.  On January 31, 2014, the SSA denied Velez's claims.  See id. at 219, 224.  On May 8, 2014, the SSA denied his reconsideration request.  See id. at 232, 236.

### A.    Hearing

Velez thus requested a hearing before an ALJ.  See id. at 241.  The ALJ held a hearing on March 17, 2015.  See id. at 125.  During the hearing, the ALJ asked if Velez would like an interpreter.  See id. at 130.  Velez responded, "Yes, if you can, because I

don't—I understand but not that much." See id. at 130.  An interpreter thus assisted with the hearing.  See id. at 130–32.

Velez testified that he sometimes uses a cane to walk, because it is hard for Velez to stand up from sitting down, but that the cane was not prescribed by a doctor. See id. at 137.

Velez testified that he can dress himself. See id. at 139.  He testified that he can also groom and bathe himself, but that he has "a little bit of a problem" doing so, because, on certain days, back pain makes it difficult for him to bend.  See id. at 139. Velez testified that he does no "household chores."  Id. at 139–40.  Specifically, he stated that he neither cooks nor cleans.  See id. at 140.  However, he testified that he does do his own laundry.  See id. at 140.  Velez testified that he has a driver's license and drives when he has an appointment or has "to go to the grocery store to buy something."  Id. at 140.  However, Velez then testified that he doesn't do his own grocery shopping.  See id. at 140.  Velez stated that he has no pets, hobbies, or special interests.  See id. at 140.

Velez stated that he had a "problem with [his] back" as a result of a 2011 "accident at work."  Id. at 141.  Velez stated that he suffers from back pain, at an intensity level of seven or eight out of ten.  See id. at 142.  He testified that the pain usually starts when he returns to an upright position after bending, see id. at 141, and that the pain is worst in the morning, see id. at 142.  Velez stated that, from a standing position, he could not bend to touch his toes, and that even bending to touch his knees caused him pain.  See id. at 148.  He stated that even stooping caused him pain.  See id. at 148.  Velez testified that "[n]othing" improves his pain, and then stated that even

his pain medication does not help much and that physical therapy did not go well.  Id. at 142.

Velez also testified that he suffers from depression, due to losing both his mother and his son within one year.  See id. at 143, 151.  He stated that he has also been diagnosed with Post Traumatic Stress Disorder.  See id. at 151.  Velez discussed his intellectual and social abilities and limitations.  See id. at 143–46.  Velez stated that he is never "on the computer, online," but then stated that he has a Facebook account. See id. at 145.

Velez stated that he cannot walk for more than ten minutes due to pain, that he can only stand up for about half an hour, and that his back was already hurting during the hearing, due to the amount of time he had been sitting.  See id. at 147.  Velez stated, however, that he could climb ramps or ladders, raise his arms over his head, and raise his arms in front of himself.  See id. at 148.

Velez stated that he can safely lift only about fifteen or twenty pounds, and can safely carry only about ten or fifteen pounds.  See id. at 146.  He said that, if he were to attempt to carry a container of milk, he would need to switch the container back and forth between his hands.  See id. at 147.  Velez testified that he can use his right hand either for fine motor tasks or to grasp an object, but that he cannot do either with his left hand.  See id. at 148–49, 155.  Velez stated that he has experienced problems with his hands for a "couple of years."  Id. at 154.  He stated that he had surgery on one of his fingers, and that, since the surgery, he has been unable to "close" that finger all the way.  See id. at 154–55.

Velez stated that his symptoms were aggravated by exposure to cold temperatures and by rain, and that he is "sensitive to things like fumes or odors or dust." See id. at 149.

    B.   Decision

On April 17, 2015, the ALJ issued a decision. See id. at 60. The ALJ found that Velez was not disabled. See id. at 78. The ALJ found that Velez met the insured status requirements of the Social Security Act and had not engaged in substantial gainful activity since his alleged onset date. See id. at 68–69. The ALJ also found that Velez had the following severe combination of impairments: (1) multi-level lumbar degenerative changes, (2) a disc bulge, (3) obesity, (4) depressive disorder, and (5) post-traumatic stress disorder (PTSD). See id. at 69. However, the ALJ found that the combination of impairments neither met nor medically equaled the severity of a "listed" impairment. See id. at 70.

The ALJ found that Velez had the residual functional capacity (RFC) to perform,

> medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c) except that the claimant can never climb ladders, ropes, or scaffolds; can occasionally climb stairs or ramps; can occasionally balance, stoop, and crouch; can never kneel or crawl; can [ ] frequently handle and finger with his left hand and has no limitations with the right hand; cannot work with exposure to cold, wetness, or concentrated exposure to pulmonary irritants; can perform simple, routine, repetitive tasks; can sustain concentration, persistence and pace for two hour segments; and can have occasional interaction with the public.

Id. at 71–72.

In deciding the RFC, the ALJ discussed Velez's testimony. See id. at 72–73. The ALJ found Velez's testimony "not fully credible," because, "although the claimant

11

testified that he only speaks and understands some English, it is listed as his primary language by his medical providers." Id. at 73 (citing id. at 521–71).

The ALJ stated that the "objective evidence undermines the claimant's allegations of disabling back pain." Id. at 74. According to the ALJ, such objective evidence included (1) the fact that, after Velez's "accident, the claimant was released to return to work without restrictions by his orthopedist," id. at 73 (citing id. at 462), (2) an MRI revealing only "mild multilevel degenerative changes" and "minimal displacement," id. at 73–74 (citing id. at 460), (3) the fact that, after his "MRI examination, the claimant was again released to return to work as a landscaper without restrictions by his orthopedist," id. at 74 (citing id. at 459), and (4) an x-ray "reveal[ing] no evidence of spondylosis or spondylolisthesis; marginal vertebral osteophytes at all levels; no evidence of compression fracture; normal transverse and spinous processes; and normal pedicles and interpediculate distances," id. at 74 (citing id. at 726).

The ALJ stated that Velez's "allegations are also undermined by his physical examinations of record, which consistently report that he retains normal range of motion, normal sensation, and normal strength in all extremities with no pain." Id. at 74 (citing id. at 518–19, 523, 528, 533, 538, 542, 546, 731, 737, 747, 752, 758, 783, 786). "Moreover," the ALJ noted, "although the claimant testified that he can only walk for about 10 minutes, he has reported to his providers that he walks on a regular basis for exercise and that he exercises daily." Id. at 74 (citing id. at 521–71, 719–67). The ALJ also found that Velez's February 27, 2015 physical therapy evaluation showed "that, despite his testimony to the contrary, he reported being independent in all areas of daily living." Id. at 74 (citing id. at 730).

The ALJ found that certain medical evidence, including evidence that contradicted Velez's statements at the hearing, "considerably undermine the claimant's testimony at the hearing that he can perform only limited lifting and that he cannot sit, stand or walk for long periods." Id. at 74.  The ALJ stated that, while "he testified that he cannot sit, stand or walk for extended periods, this limitation is not reported in the medical record." Id. at 74.  Based on Dr. Goccia's opinion, the ALJ did "not credit claimant's allegations regarding his physical limitations." Id. at 74.

In deciding the RFC, the ALJ gave "minimal weight" to the opinion of Velez's treating physician, Dr. Khalid, because the ALJ found Dr. Khalid's opinion to have "no probative value." Id. at 75.  The ALJ explained the decision to give Dr. Khalid's opinion minimal weight as follows:

> As the doctor merely completed a checklist form, it is unclear how he reached his conclusions.  The doctor simply checked marked boxes indicating the claimant had limitations that would increase the likelihood of claimant obtaining benefits but did not explain why those limitations were chosen.  In particular, he gave no examples of objective findings, documented symptoms, or other medical evidence to support his conclusions.  Indeed, it appears he relied upon the claimant's subjective statements of self-imposed limitations as a basis for the opinion.  Moreover,  the doctor's opinion is inconsistent with his own treatment notes, which as noted [earlier in the ALJ decision] show essentially normal physical examination findings and report that the claimant presents for treatment in no acute distress (Exhibit 5F [Tr. at 521–71]).  The doctor's opinion is also without substantial support from the other evidence of record, which also reports essentially normal physical examinations.

Id. at 75.

The ALJ then found that, while Velez could no longer perform any of his past work, other jobs existed for Velez in significant numbers in the national economy.  See

id. at 77.  On December 29, 2015, the SSA Appeals Council denied Velez's request to review the ALJ decision.  See id. at 4.

## IV.    LEGAL STANDARD

Social Security benefits are payable to a claimant with a "disability."  42 U.S.C. § 423(a)(1)(E).  A disability includes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which lasts at least a year.  42 U.S.C. § 423(d)(1).  To be disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

"A district court reviewing a final . . . decision [of the SSA] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function."  Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive."  42 U.S.C. § 405(g).  Accordingly, the court may not make a de novo determination of whether a claimant is disabled.  See Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990); Smith v. Comm'r of Soc. Sec., No. 15-CIV-5356 (ER) (JCF), 2017 WL 65836, at *7 (S.D.N.Y. Jan. 4, 2017).  Rather, the court's function is to ascertain whether the SSA applied the correct legal principles in reaching its conclusion, and whether the decision is supported by "substantial evidence."  See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); see also McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014).

## V.      DISCUSSION

###       A.      Treating Physician Rule

Velez argues that the ALJ erred in giving "minimal weight" to the opinion of

Velez's treating physician.  See Mem. in Supp. of Mot. for J. at 2.  The court agrees,

because the ALJ failed to identify a valid reason to decline to give Dr. Khalid's opinion

controlling weight.

 "[T]he SSA recognizes a 'treating physician' rule of deference to the views of the

physician who has engaged in the primary treatment of the claimant."  Burgess v.

Astrue, 537 F.3d 117, 128 (2d Cir. 2008).  SSA regulations give the opinion of a treating

physician "controlling weight," so long as that opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2);

416.927(c)(2); see also Lesterhuis v. Colvin, 805 F.3d 83, 88 (2d Cir. 2015).  As Colvin

acknowledges, an ALJ must give "good reasons" for declining to give controlling weight

to a treating physician opinion.  See Mot. to Affirm at 3 (citing Sanders v. Comm'r of

Soc. Sec., 506 F. App'x 74, 77 (2d Cir. 2012)).

Here, the ALJ declined to give Dr. Khalid's opinion controlling weight.  See Tr. at

75.  Construed broadly, the ALJ's decision can be read as finding both (1) that Dr.

Khalid's opinion was not well-supported, and (2) that the opinion was inconsistent with

other evidence.  See id. at 75.

###            1.      Support

The ALJ did not state explicitly that Dr. Khalid's opinion was not "well-supported

by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§

404.1527(c)(2); 416.927(c)(2).  However, the ALJ decision says that "it is unclear how"

Dr. Khalid "reached his conclusions," because

> [t]he doctor simply checked marked boxes indicating the claimant had limitations that would increase the likelihood of claimant obtaining benefits but did not explain why those limitations were chosen.  In particular, he gave no examples of objective findings, documented symptoms, or other medical evidence to support his conclusions.  Indeed, it appears he relied upon the claimant's subjective statements of self-imposed limitations as a basis for the opinion.

Tr. at 75.  A lack of support "by medically acceptable clinical and laboratory diagnostic

techniques" is a valid reason to decline to give controlling weight to a treating physician

opinion.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  The court thus concludes that the

ALJ has, "applied the correct legal principles" in concluding that Dr. Khalid's opinion was

not entitled to controlling weight for this reason.  Johnson, 817 F.2d at 985.

The court must next "decide whether the determination" that Dr. Khalid's opinion

was unsupported by valid diagnostic techniques "is supported by 'substantial evidence.'"

Id. at 985.  The court finds that the ALJ's determination as to this matter was not

"supported by 'substantial evidence.'"  Id. at 985.

Velez argues that "the ALJ erred by finding Dr. Khalid provided no support for his

opinions."  See Mem. in Supp. of Mot. for J. at 2.  The court agrees.  Dr. Khalid's

opinion states that it is based on the following "[c]linical and laboratory findings:" (1)

limited and partial range of motion in Velez's shoulders, (2) painful and decreased

flexion in Velez's spine, (3) the fact that Velez "gets tired easily," (4) the fact that Velez

"feels depressed," and (5) the results of an x-ray of Velez's spine.  See Tr. at 643.

While some of these findings—such as the finding that Velez experienced pain and

depression—necessarily must have involved Velez's subjective statements, Dr. Khalid

16

also offered his opinion that Velez is not "a malingerer," thus indicating that Dr. Khalid's interviews with his patient should be trusted as a form of clinical diagnostic technique. Id. at 643. "'Medically acceptable clinical and laboratory diagnostic techniques' include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." Burgess v. Astrue, 537 F.3d at 128 (internal quotation marks and brackets omitted). Because "a treating source's opinion may take into account the claimant's own subjective complaints or report," an ALJ errs where the ALJ treats a medical source's reliance on a "claimant's subjective complaints" as a reason to assign the medical source's opinion lesser weight. Kotkowicz v. Colvin, No. 13-CV-6472 (CJS), 2014 WL 3819213, at *8 (W.D.N.Y. Aug. 4, 2014). Furthermore, Dr. Khalid's treatment notes discuss an additional piece of diagnostic support for Dr. Khalid's opinion, beyond those findings listed in Dr. Khalid's opinion, namely, an MRI reporting a bulging disc. See id. at 552.

Dr. Khalid's treatment notes support each of Dr. Khalid's opinions regarding Velez's abilities. Dr. Khalid's opinion that, in an eight-hour workday, Velez could perform one hour of seated work, and less than one hour of work that involves standing, walking, or both, see id. at 645, is supported by (1) the multitude of notes regarding Velez's chronic back pain, see id. at 526, 544, 551–54, 558, 740, 761, which is aggravated by, inter alia, "sitting and standing," id. at 526, and (2) the note describing Velez's complaint that his right foot hurt when he walked, and stating that the foot problem had persisted for two weeks, see id. at 745. Dr. Khalid's opinion that Velez could "[o]ccasionally" lift or carry up to ten pounds, but not more, id. at 645, is supported by (1) the doctor's note stating that Velez's back pain is "aggravated by . . . lifting," id. at

761, as well as (2) Dr. Khalid's note stating that, on one occasion, Velez's hands became so weak that he could not even "hold a gallon of milk," id. at 735.  Dr. Khalid's opinion that Velez can "[n]ever," or "[r]arely," reach overhead; and can only "[o]ccasionally" grab, turn, or twist objects, or use his hands or fingers for fine manipulations, id. at 646, is supported by (1) Dr. Khalid's extensive notes regarding chronic back pain, see, e.g., 526; (2) Dr. Khalid's multiple notes regarding shoulder pain, see, e.g., id. at 556, 565, 761; and Dr. Khalid's notes stating that, at varying points, Velez (3) experienced his right hand's middle finger "locking up," id. at 742, (4) experienced mild pain when he moved his right hand's middle finger, id. at 538, (5) complained of finger numbness, see id. at 564, (6) complained of severe arm pain, lasting three weeks, at an intensity level of ten out of ten, see id. at 565, (7) complained of wrist pain, at an intensity level of six out of ten, see id. at 567, (8) had "difficulty making a fist [with his] left hand," id. at 761, and (9) suffered from a reduced range of motion in his shoulders, see id. at 764.  Thus, substantial evidence does not exist for the ALJ's implicit finding that Dr. Khalid's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  This implicit finding thus does not provide a basis upon which this court can affirm the ALJ's refusal to afford the treating physician opinion controlling weight.

Colvin cites Camille v. Colvin, 652 F. App'x 25 (2d Cir. 2016), as a decision permitting an ALJ to discount a treating physician opinion that lacked a narrative explanation.  In Camille, however, "each of the check-box forms" that the treating physician completed in giving his opinion, "specifically requested narrative explanation of any opined limitation," but the physician "declined to provide" such "particulars."  Id. at

27.  Here, however, the Disability Impairment Questionnaire that Dr. Khalid completed did not request a narrative explanation for each opined limitation.  <u>See</u> Tr. at 645–47 (not requesting narrative explanation for number of hours patient can perform seated or standing work; for how much weight patient can lift or carry; nor for patient's ability to reach, handle, or finger).  When the Questionnaire did request a narrative explanation, Dr. Khalid usually provided one.  <u>See</u> <u>id.</u> at 647 (explaining that emotional factors affect Velez because, <u>inter alia</u>, Velez "gets depressed easily" and stating in "[a]dditional comments" section that Velez is "unable to be gainfully employed due to his medical condition."); <u>but see</u> <u>id.</u> at 646 (failing to provide narrative explanation for how symptoms will increase if Velez is placed in a competitive work environment).  The court concludes that <u>Camille</u> is not on point.

In addition to implicitly finding that the treating physician opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2), the ALJ also found that "[t]he doctor's opinion is [ ] without substantial support from the other evidence of record," Tr. at 75.  Dr. Khalid's opinion need not have "substantial support from the other evidence of record," <u>id.</u> at 75, however, to be controlling.  To the contrary, Dr. Khalid's opinion is controlling as long as it both (1) is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); <u>see also</u> <u>Lesterhuis</u>, 805 F.3d at 88.

2.    Consistency

The ALJ also declined to give Dr. Khalid's opinion controlling weight in part because the ALJ found that "the doctor's opinion is inconsistent with his own treatment notes."  Tr. at 75.  Because Dr. Khalid's treatment notes constitute substantial evidence in the case Record, see id. at 521–67, 735–67, an inconsistency between Dr. Khalid's opinion and his treatment notes would be a legally valid reason for the ALJ not to give Dr. Khalid's opinion controlling weight, see 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lesterhuis, 805 F.3d at 88.  Where a "medical source statement conflict[s] with his own treatment notes, the ALJ [is] not required to afford his opinion controlling weight." Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013).  The ALJ therefore "applied the correct legal principles" in concluding that Dr. Khalid's opinion was not entitled to controlling weight for this reason.  Johnson, 817 F.2d at 985.

The court must next "decide whether the determination" that Dr. Khalid's opinion was inconsistent with his treatment notes "is supported by 'substantial evidence.'"  Id. at 985.  The court finds that the ALJ's determination was not "supported by 'substantial evidence.'"  Id. at 985.

The ALJ found that Dr. Khalid's treatment notes were inconsistent because the notes "show essentially normal physical examination findings and report that the claimant presents for treatment in no acute distress."  Tr. at 75.  In support of his statement that Dr. Khalid's notes show "essentially normal physical examination findings" and "no acute distress," the ALJ cited "Exhibit 5F."  Id. at 75.  Exhibit 5F spans pages 521–571 of the Certified Transcript of the Record, and contains many of Dr.

20

Khalid's treatment notes.[3]  See id. at 521–67.  The court has thoroughly examined this cited portion of the record, as well as the remainder of Dr. Khalid's treatment notes, see id. at 735–67, to determine whether the ALJ's statement is supportable.

The court has determined that a modicum of evidence supports the ALJ's statement that Dr. Khalid's treatment notes showed "essentially normal physical examination findings."  Id. at 75.  Specifically, during two of the more recent office visits, Dr. Khalid noted that a physical examination of all four of Velez's extremities produced normal results.  See id. at 752, 758.  While the ALJ did not cite the notes from these particular visits in support of his statement, id. at 75, the court treats the notes from these visits as notes that could support the ALJ's statement.  Additionally, Dr. Khalid noted on multiple occasions that Velez had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection."  See id. at 523, 533, 542, 546, 737; see also id. at 538 (finding normal range of motion, muscle strength, and stability in all extremities with no pain, except that the right hand middle finger had a painful range of motion).  Notes from most of these occasions are within the portion of the record that the ALJ cited.  See id. at 75 (citing Exhibit 5F, which includes, inter alia, id. at 523, 533, 542, and 546).  Despite this number of notations indicating that physical examinations of Velez's extremities produced normal results, Dr. Khalid's most recent office visit notes show abnormal physical examination findings, see id. at 764 ("Lumbar spine—Range of motion: moderate pain [with] motion.  Shoulder—Left: Range of motion: mildly reduced [range of motion], Right: Range of motion: mildly reduced [range

---

[3] Exhibit 5F also includes four pages of treatment notes signed by a provider other than Dr. Khalid, see id. at 561–62, 568–69, and a two-page consultation report, see id. at 570–71.  Dr. Khalid's remaining treatment notes are contained within pages 735–67 of the Certified Transcript of the Record.

of motion]"), as do notes from two other relatively-recent visits, id. at 747 ("Foot/ankle—Right: Range of motion: mild pain [with] motion."); see id. at 742 (describing "moderate pain w[ith] motion" in Velez's "lumbar spine," and stating that his right third "finger locks up").  Notes from these most recent visits are outside of the portion of the record that the ALJ cited in support of the ALJ's statement regarding physical examination findings. See id. at 75 (citing only Exhibit 5F, which does not include Tr. at 742, 747, or 764).

Additionally, Dr. Khalid's notes repeatedly describe Velez as suffering from pain and difficulties with movement, although these notes generally appear to reflect Velez's complaints to the doctor, rather than physical examination results.  See, e.g., id. at 735 ("This 55 year old male presents with [ ] bilateral pain and swelling on both legs and hands . . . . [N]o strength in hands.  Can't hold a gallon of milk."); id. at 736 (listing back pain, joint pain, and joint swelling as symptoms); id. at 740 ("Back pain, right foot, and hand pain persist . . . [C]urrent meds not helping.); id. at 744 ("Patient [complains of] foot pain when he walks."); id. at 761 ("The patient describes the pain as an ache and throbbing.  Symptoms are aggravated by bending, changing positions and lifting; Patient reports severe pain last 2–3 days . . . [and] also [complains of bilateral] shoulder pain[ and] difficulty making a fist."); id. at 526 ("Symptoms are aggravated by bending, changing positions, daily activities, lying/rest, sitting and standing."); id. at 538 (stating that Velez's right "hand middle finger" has a "mildly painful" range of motion); id. at 544 ("Symptoms are aggravated by bending and twisting."); id. at 550 (stating that Velez complains of right "knee pain causing difficulty to walk").  The notes that describe Velez as suffering from pain and difficulties with movement fall both within, and outside of, the portion of the record cited by the ALJ in support of the ALJ's statement regarding

22

physical examination findings.  See id. at 75 (citing Exhibit 5F, which includes Tr. at

526, 538, 544, and 550, but not Tr. 735–36, 740, 744, or 761).  Because Dr. Khalid's

treatment notes themselves could be considered inconsistent—in that they both show

some normal physical examination findings, see id. at 752, 758, 523, 533, 542, 546,

737, and also report pain and other physical problems, see id. at 526, 538, 544, 550,

735–36, 740, 742, 744, 761, 747, 764—the court acknowledges that some evidence

exists within Dr. Khalid's notes for the ALJ's statement that Dr. Khalid's notes showed

"essentially normal physical examination findings."  Id. at 75.  However, in light of the

prevalence of comments in the doctor's notes regarding physical problems—including

persistent notations regarding back pain and associated issues, see id. at 526, 528,

544–46, 551–54, 558, 740, 742, 761, 764—, the court cannot find substantial evidence

in the record for the ALJ's implicit conclusion that certain normal physical examination

findings make Dr. Khalid's treatment notes inconsistent with Dr. Khalid's opinion.  See

id. at 75.  Furthermore, in the portion of the record cited as support for the ALJ's

"essentially normal physical examination findings" statement, id. at 75 (citing id. at 521–

71), Dr. Khalid repeatedly used a computerized format for reporting "Physical Exam"

results which included only the following sections: (1) "Constitutional," (2) "Eyes," (3)

"Neck/Thyroid," (4) "Respiratory," (5) "Cardiovascular," (6) "Abdomen," (7)

"Musculoskeletal," (8) "Extremities," and (9) "Neurological," id. at 523, 528, 533, 538,

542, as well as, on one occasion, (10) "Ears," (11) "Nose/Mouth/Throat" and (12)

"Pulses"  546–47.  In the cited portion of the record, whenever Dr. Khalid used this

particular computerized format, his notation in the "Musculoskeletal" section always

contained the standard, "[n]ormal range of motion, muscle strength, and stability in all

extremities with no pain on inspection" language.  Id. at 523, 528, 533, 538, 542, 546

(emphasis added).  Thus, the "normal" physical examination results frequently exclude

any findings at all regarding Velez's chief complaint—his back.  Instead of recording

findings regarding Velez's back in the "Physical Exam" section of his treatment notes,

Dr. Khalid frequently recorded back-related findings in other sections of his notes.  See,

e.g., id. at 526–27 (discussing "back pain" in "History of Present Illness," "Pain Scale,"

and "Screening Summary"  sections of treatment notes, but not in "Physical Exam"

section).  On other occasions recorded within the portion of the record that the ALJ

cites, Dr. Khalid reported physical examination results by using a check-box form, which

listed terms including "musculoskeletal."  See id. at 548–567.  When Dr. Khalid used the

check-box form, the doctor simply indicated that the physical exam with regard to

Velez's musculoskeletal system was either (1) normal, on several occasions, see id. at

548–49, 551–53, 555–57, 559–60, 563–64, 566, or (2) abnormal, on a few other

occasions, see id. at 550, 554, 558, 565, 567.  Even on certain occasions when Dr.

Khalid indicated via check mark that Velez's musculoskeletal system was normal,

however, Dr. Khalid also described, "occasional back pain," id. at 552, mentioned a

"work-related injury," id. at 553, or indicated that Velez had complained of chest pain

which radiated to his shoulder and back, id. at 556.  Thus, while some evidence

supports the ALJ's statement that Dr. Khalid's treatment notes showed "essentially

normal physical examination findings," id. at 75, Dr. Khalid's indications regarding

normal physical examination findings do not, without more, make Dr. Khalid's treatment

notes inconsistent with Dr. Khalid's opinion.

Furthermore, the court certainly cannot find substantial evidence for the ALJ's assertion that Dr. Khalid's treatment notes show "no acute distress." Id. at 75. The most recent treatment notes, which are outside of the portion of the record cited by the ALJ, describe back pain with a severity level of eight out of ten, as well as shoulder pain, difficulty making a fist, and depression. See id. at 761, 764. Various treatment notes have also described that, at some point, Velez experienced, inter alia, (1) weakness in Velez's hands, so severe that Velez could not even "hold a gallon of milk," id. at 735, (2) persistent and worsening back pain at an intensity level of seven out of ten, see id. at 526–28, 544–46, 553, (3) depression so severe that it included suicidal thoughts, see id. at 555, (4) arm pain at a severity level of ten out of ten, see id. at 565, (5) foot and ankle pain, see id. at 745–47, and (6) knee pain, see id. at 550. These descriptions fall both within, and outside of, the portion of the record that the ALJ cited to support his "no acute distress" statement. Id. at 75. For these reasons, a finding of "no acute distress" is unsupportable.

More broadly, the court cannot find substantial evidence to support the ALJ's overall conclusion that the treating physician's opinion was inconsistent with his treatment notes. See id. at 75. Specifically, the court cannot find evidence in Dr. Khalid's treatment notes to contradict Dr. Khalid's opinion that (1) in an eight-hour workday, Velez can perform only one hour of seated work, and less than one hour of work that involves standing, walking, or both, (2) Velez can only "[o]ccasionally" lift or carry up to ten pounds, but not more, and (3) Velez can "[n]ever," or "[r]arely," reach overhead; and can only "[o]ccasionally" grab, turn, or twist objects, or use his hands or fingers for fine manipulations. Id. at 645–46. The ALJ's finding that Dr. Khalid's opinion

was "inconsistent with the other substantial evidence in [the] case record," 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2), namely, his own treatment notes, thus does not provide a basis upon which to affirm the denial of controlling weight to Dr. Khalid's opinion.

Because neither (1) the ALJ's implicit finding that the treating physician's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," nor (2) the ALJ's finding that the opinion is "inconsistent with the other substantial evidence in [the] case record," are supported by substantial evidence, the ALJ failed to identify a good reason to decline to give "controlling weight" to the physician's opinion.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  Because the ALJ failed to identify "good reasons," Sanders, 506 F. App'x at 77, to decline to give controlling weight to Dr. Khalid's opinion, the court need not consider Velez's argument that, "[e]ven if the ALJ did not err by refusing to give controlling weight to the opinions from treating physician Khalid," the ALJ nonetheless should have afforded more than minimal weight to Dr. Khalid's opinion.  See Mem. in Supp. of Mot. for J. at 5.

B.    Credibility Evaluation

Velez argues that the ALJ failed to properly evaluate Velez's credibility.  See Mem. in Supp. of Mot. for J. at 6.  Because the court must remand for proper application of the treating physician rule, the court need not decide whether the ALJ's credibility determination constitutes a basis for remand.  Nevertheless, on remand, the ALJ should reconsider its credibility determination in light of this Ruling.

"It is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Gates v. Astrue, 338 F. App'x 46, 48 (2d Cir. 2009) (brackets omitted) (quoting Aponte

26

v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).  In
particular, the ALJ is required to assess the credibility of the plaintiff's subjective
complaints.  See 20 C.F.R. §§ 404.1529(c)(4); 416.929(c)(4).  "As a fact-finder, an ALJ
is free to accept or reject testimony."  Williams ex rel. Williams v. Bowen, 859 F.2d 255,
260 (2d Cir. 1988).  "Credibility findings of an ALJ are entitled to great deference and
therefore can be reversed only if they are patently unreasonable."  Pietrunti v. Dir.,
Office of Workers' Comp. Programs, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal
quotation marks omitted).

That said, "[a] finding that the witness is not credible must nevertheless be set
forth with sufficient specificity to permit intelligible plenary review of the record."
Williams, 859 F.2d at 260–61.  An ALJ's failure to provide specific reasons for finding a
claimant's testimony not credible is a sufficient basis for reversal and remand to the
Administration.  See id. at 260–61.  "Further, whatever findings the ALJ makes must be
consistent with the medical and other evidence.  Put another way, an ALJ must assess
subjective evidence in light of objective medical facts and diagnoses."  Id. at 261
(citation omitted).  "However, [the SSA] will not reject [a claimant's] statements about
the intensity and persistence of [his] pain or other symptoms or about the effect [his]
symptoms have on [his] ability to work solely because the available objective medical
evidence does not substantiate [his] statements."  20 C.F.R. § 404.1529(c)(2); see also
20 C.F.R. § 416.929(c)(2).

Here, the ALJ found Velez "not fully credible" for several reasons.  See Tr. at 73–
74.  The ALJ explained his reasons in detail, giving citations to relevant evidence in the
record.  See id. at 73–74.  As a preliminary matter, the court thus finds that the ALJ has

"set forth" his "finding that the witness is not credible" "with sufficient specificity to permit intelligible plenary review of the record." Williams, 859 F.2d at 260–61.  The level of specificity is thus not a basis for reversal here.  See id. at 260–61.  The court discusses each of the ALJ's reasons in turn.

### 1.   English Proficiency

First, the ALJ found a contradiction between the claimant's self-proclaimed low level of English proficiency and the higher level of proficiency implied by the notations on Velez's medical records.  See Tr. at 73 (citing Tr. at 521–71).

During the hearing, Velez had accepted the ALJ's offer of an interpreter, stating that he "understand[s English,] but not that much."  See id. at 130.  Dr. Khalid's treatment notes, however, state that Velez's "[p]rimary language is English."  Id. at 526, 531, 536, 540, 544.  The ALJ thus had a valid reason for finding "that the claimant was not fully credible in his testimony" due to this apparent contradiction.  Id. at 73.

The court acknowledges (1) that Dr. Khalid's treatment notes suggest that Velez does not speak English at home, see Tr. at 526, and (2) that Dr. Khalid's treatment notes theoretically could have misreported Velez's primary language.  However, these facts are insufficient to make the ALJ's credibility finding "patently unreasonable." Pietrunti, 119 F.3d at 1042.

Furthermore, as Colvin explains, see Mot. to Affirm at 5, a claimant's inability to speak English can play a role in the SSA's determination of whether to award benefits, see 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5) ("[W]e consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do.").  The ALJ thus had a good reason to view an apparent contradiction on this topic with

skepticism.  Velez argues, correctly, that he "never testified he cannot speak <u>any</u> English."  Mot. for J. on Pleadings at 8 (emphasis added).  The ALJ nonetheless could have reasonably concluded that, by stating that Velez does not understand "that much [English]," Tr. at 130, Velez underrepresented a legally-significant vocational ability.

For these reasons, the aspect of the ALJ's credibility determination that relied on Velez's language-related representation was not "patently unreasonable."  <u>Pietrunti</u>, 119 F.3d at 1042.

### 2. Back Pain

Second, the ALJ stated that the "objective evidence undermines the claimant's allegations of disabling back pain."  Tr. at 74.

Velez's allegations of disabling back pain consisted of stating that he suffers from back pain at an intensity level of seven or eight out of ten, <u>see</u> <u>id.</u> at 142, that the pain usually starts when he returns to an upright position after bending, <u>see</u> <u>id.</u> at 141, that the pain acts up whenever he touches his knees and that he cannot touch his toes, <u>see</u> <u>id.</u> at 148, and that even stooping hurts him, <u>see</u> <u>id.</u> at 148.

The "objective evidence" that the ALJ cited includes the fact that Velez's orthopedist released him to return to work after his accident.  <u>See</u> <u>id.</u> at 73 (citing <u>id.</u> at 462).  Indeed, the Treatment Report that the ALJ cites demonstrates that Velez received approval to "return to work on 12/15/11 with no limitations."  <u>Id.</u> at 462.  The Treatment Report states that Velez's injury had occurred a few months beforehand.  <u>Id.</u> at 462.  The ALJ also cites Velez's MRI results as evidence that his back problems are relatively mild.  <u>See</u> <u>id.</u> at 73–74.  The Results state, <u>inter alia</u>, that Velez's "alignment is unremarkable," that his "bone barrow signal is benign in appearance," and that Velez

29

has only "mild" "disc desiccation" throughout his "lumbar spine;" although Velez has "diffuse disc bulging" at various locations. Id. at 460–62. The ALJ then cites a Consultation / Referral Form dated about a week after Velez's MRI, which states that Velez's "current work status" is "full duty," and that Velez works as a "[l]andscaper." Id. at 459. The ALJ thus reasonably could have extrapolated from this form that Velez can perform landscaping work—including any required bending or stooping—despite his back condition. Finally, the ALJ correctly describes an x-ray as revealing, inter alia, "no evidence of spondylosis or spondylolisthesis; . . . no evidence of compression fracture; normal transverse and spinous processes; and normal pedicles and interpediculate distances." Id. at 74 (citing id. at 726).

The court concludes that the ALJ's finding that the "objective evidence undermines the claimant's allegations of disabling back pain," Tr. at 74, is "consistent with the medical [ ] evidence." Williams, 859 F.2d at 261. While the ALJ must "not reject" Velez's "statements about the intensity and persistence of [his] pain," or the effect thereof, "solely because the available objective medical evidence does not substantiate [his] statements," 20 C.F.R. § 404.1529(c)(2); 20 C.F.R. § 416.929(c)(2) (emphasis added), the ALJ made his finding after already having concluded that Velez's apparent misrepresentation about his English proficiency decreased Velez's credibility.

For these reasons, the ALJ's discrediting of Velez's representations regarding the disabling effects of Velez's back pain was not "patently unreasonable." Pietrunti, 119 F.3d at 1042. Nevertheless, on remand, the ALJ should consider whether reweighing Dr. Khalid's opinion leads the ALJ to give greater credit to Velez's representations regarding back pain. As discussed above, see supra at 7–8, Dr. Khalid

30

opined that Velez suffers from painful and decreased flexion in his spine, <u>see</u> Tr. at 643, that chronic back pain is one of Velez's "primary symptoms," <u>id.</u> at 644, and that bending precipitates or aggravates the pain, <u>see</u> <u>id.</u> at 644.

3.   Extremities

Third, the ALJ stated that Velez's testimony was "undermined by his physical examinations of record, which consistently report that he retains normal range of motion, normal sensation, and normal strength in all extremities with no pain." Tr. at 74. In support of this statement, the ALJ cited "Exhibit 4F, p. 3, 4; 5F, p. 3, 8, 13, 18, 22, 26; 16F, p13, 19, 29, 34, 40; 17F, p. 16, 19." These citations make up pages 518–19, 523, 528, 533, 538, 542, 546, 731, 737, 747, 752, 758, 783, and 786 of the Certified Transcript of the Record. The court has thoroughly examined these cited pages, to determine whether they provide support for the ALJ's statement regarding "consistent[ ]" reports of "normal range of motion, normal sensation, and normal strength in all extremities with no pain." <u>Id.</u> at 74.

The portions of Velez's testimony which appear most relevant to the health of Velez's extremities were the following:  First, Velez stated that he can safely lift only about fifteen or twenty pounds, and can safely carry only about ten or fifteen pounds. <u>See</u> <u>id.</u> at 146. The court notes that such difficulties could theoretically be caused by problems with a person's arms, although such difficulties could also theoretically be caused by problems with a person's back. Second, Velez testified that, if he were to attempt to carry a container of milk, he would need to switch the container back and forth between his hands. <u>See</u> <u>id.</u> at 147. Third, Velez testified that he cannot use his

left hand for fine motor tasks, nor can he grasp objects with his left hand, and that he cannot fully "close" one finger on his left hand.  See id. at 148–49, 154–55.

As the ALJ noted, the physical examinations of Velez's extremities produced mostly normal results.  See id. at 518–19, 523, 528, 533, 542, 546, 737, 752, 758, 786. These normal extremity physical examination results are reported on most of the pages cited by the ALJ for the ALJ's statement regarding extremities.  See id. at 518–19, 523, 528, 533, 542, 546, 737, 752, 758, 786.  However, one physical examination found that Velez's right hand's middle finger had a "mildly painful" range of motion, id. at 538, one found that he experienced "mild pain" when moving his right foot or ankle, id. at 747, and one found that he had "moderate tenderness" in his left hand's ring finger and that his wrists were "abnormal," id. at 783.[4]  These physical examination results are reported on pages among those cited by the ALJ for the ALJ's statement regarding extremities.

While the ALJ's use of the term "consistently," id. at 74, would appear to be an overstatement, the physical examination results could, viewed in a vacuum, be construed as supporting a finding that Velez exaggerated the problems with his extremities.  However, Dr. Khalid has opined that (1) Velez can only "[o]ccasionally" lift or carry up to ten pounds, and not more, id. at 645, and (2) Velez can only "[o]ccasionally" grab, turn, or twist objects, or use his hands or fingers for fine manipulations, id. at 646.  As discussed above, the ALJ has failed to identify a proper reason to deny Dr. Khalid's opinion controlling weight.  If Dr. Khalid's opinion receives controlling weight on remand, the ALJ thus should no longer discredit Velez's

---

[4] Another physical examination result stated that Velez had impairments including reduced "joint integrity and mobility," reduced "muscle strength," "pain," and reduced range of motion, although these impairments may have referred only to Velez's back, rather than to his extremities.  Id. at 731.  This result was reported in one of the pages cited by the ALJ for the ALJ's statement regarding extremities.

representations which were consistent with Dr. Khalid's opinion.  Furthermore, Velez's

professed difficulty with lifting and carrying could be a symptom of his back problems,

and not of problems with his extremities.  The court thus notes that the ALJ's reference

to Velez's "physical examinations of record, which consistently report that he retains

normal range of motion, normal sensation, and normal strength <u>in all extremities</u> with no

pain," Tr. at 74 (emphasis added), cannot provide a reason to discredit Velez's

testimony regarding his difficulty with lifting and carrying.

       4.    Daily Living

Fourth, the ALJ found a contradiction between Velez's testimony and a February

27, 2015 Physical Therapy Adult Evaluation, with regard to whether Velez was

"independent in all areas of daily living."  <u>Id.</u> at 74 (citing <u>id.</u> at 730).  The ALJ did not

explain exactly how the ALJ believed Velez's testimony conflicted with the Evaluation.

<u>See id.</u> at 74 (stating only that the Evaluation "shows that, despite his testimony to the

contrary, he reported being independent in all areas of daily living.")

At the hearing, Velez testified that he has "a little bit of a problem" grooming and

bathing himself, because, on certain days, back pain makes it difficult for him to bend.

<u>See id.</u> at 139.  The Physical Therapy Adult Evaluation states that Velez can bathe

independently.  <u>Id.</u> at 730.  The court does not see an inherent contradiction between

Velez's testimony regarding bathing and the Evaluation, because an individual very well

could be able to bathe himself, <u>see id.</u> at 730, despite finding the task slightly difficult,

<u>see id.</u> at 139.  For instance, a person who felt pain while bending down to bathe his

feet, or who found it difficult to reach certain areas of his body without use of a long-

handled sponge or a removable shower head, might honestly state that he had "a little

bit of a problem" bathing, id. at 139, but he would not necessarily need to resort to enlisting someone else's help in this very personal activity.  The court notes that, according to one of his doctor's records, Velez's symptoms were "aggravated by bending" and "daily activities."  Id. at 526.  However, the Physical Therapy Adult Evaluation reasonably could have led the ALJ to conclude that any difficulty Velez has in grooming himself must be relatively minor.

Velez also testified that he does no "household chores," and neither cooks nor cleans.  Id. at 139–40.  The Physical Therapy Adult Evaluation, however, does not address Velez's ability to do chores such as cooking or cleaning.  Id. at 730.  Thus, the court can see no contradiction with regard to Velez's ability to do chores.

On remand, the ALJ might reconsider his implicit finding that Velez misrepresented his level of independence in areas of daily living.  However, the ALJ need not disturb his implicit finding that Velez is, in fact, able to bathe independently, as "substantial evidence" supported this finding.  Johnson, 817 F.2d at 985.

### 5.   Walking, Lifting, Sitting, Standing

Fifth, the ALJ expressed skepticism regarding Velez's difficulties walking, lifting, sitting, and standing.

The ALJ found a contradiction between Velez's statement "that he can only walk for about 10 minutes," Tr. at 74; see also Tr. at 147 (testifying that Velez cannot walk for more than ten minutes due to pain), and notations on Velez's medical records which, according to the ALJ, indicate "that he walks on a regular basis for exercise and that he exercises daily," id. at 74 (citing id. at 521–71, 719–67).

Indeed, Velez's medical notes state that his "[e]xercise includes walking," id. at 526, and that he has "completed" an instruction to "walk briskly every day," id. at 534. However, other medical notes—within the portion of the record cited as support for the statement that Velez walks regularly and exercises daily—state that Velez complains of pain in his right foot when he walks, see id. at 745, and that the doctor believed daily exercise would improve Velez's symptoms, see id. at 724, thereby indicating that Velez presumably did not exercise every day.  Furthermore, the court notes that there is no inherent contradiction between walking daily and only being able to walk for ten minutes—Velez very well could take short walks daily.

The ALJ also found that "testimony at the hearing that [Velez] can perform only limited lifting and that he cannot sit, stand or walk for long periods" was "considerably undermined" by (1) the evidence, discussed above, regarding Velez's extremities, (2) Velez's independence in daily living activities, discussed above, (3) the evidence, discussed above, regarding Velez's walking habits, and (4) the fact that Velez's "orthopedic evaluations . . . report that he presents for examination in no acute distress ([citing 635, 637–38)]." Id. at 74.  A note from an orthopedic evaluation indeed states that Velez presented "in no apparent distress." Id. at 636.

The ALJ also found that, while Velez "testified that he cannot sit, stand or walk for extended periods, this limitation is not reported in the medical record." Id. at 74; see also id. at 147 (testifying that Velez can only stand for about half an hour, and that sitting at the hearing hurt him).  The medical record, however, includes the following doctor's notations which indicate limitations in sitting, standing, or walking:  Regarding sitting and standing, a note states that Velez's symptoms are aggravated by "sitting and

standing." Id. at 526.  Regarding walking, notes state that (1) Velez presented with right knee pain, which had caused him difficulty walking for at least a month, despite Velez not having experienced trauma to the area, see id. at 550, and (2) Velez complained of pain in his right foot when he walked, see id. at 745.

The ALJ should reconsider the finding that Velez's expressed limitations in walking, lifting, sitting, and standing were not credible, for the following reasons:  (1) The ALJ has failed to identify any discrepancy between Velez's testimony regarding his ability to walk, and the medical evidence of Velez's walking habits.  (2) The ALJ's finding regarding Velez's expressed limitations in walking, lifting, sitting, and standing depended in part on the health of Velez's extremities.  As discussed above, the ALJ should reevaluate the health of Velez's extremities after reweighing the Dr. Khalid opinion.  (3) The ALJ has failed to identify any inconsistency between Velez's independence in areas of daily living, and Velez's professed difficulty walking, lifting, sitting and standing.  (4) The finding that the medical record does not report a limitation in Velez's ability to "sit, stand or walk for extended periods," id. at 74, is inaccurate.

6.     Dr. Goccia's Opinion

Sixth, Dr. Goccia's opinion influenced the ALJ in discrediting Velez's testimony "regarding his physical limitations."  Id. at 74 (citing Tr. at 516–20).  The ALJ recounted, correctly, that, "[u]pon physical examination, Dr. Goccia reported that the claimant retained full lumbar range of motion and full range of motion in all extremities and joints. Additionally, claimant retained full, 5/5 strength in all extremities and full grip strength bilaterally."  Id. at 74 (citations omitted) (citing id. at 518–19).

The court agrees that the ALJ has identified portions of Dr. Goccia's opinion which appear to contradict portions of Velez's testimony.  See id. at 146 (testifying that Velez can safely lift only about fifteen or twenty pounds, and can safely carry only about ten to fifteen pounds); id. at 147 (testifying that he would need to switch a carton of milk back and forth between his hands); id. at 148–49, 155 (testifying that he cannot use his left hand for fine motor tasks, nor to grasp an object).[5]  However, Dr. Khalid's opinion provides some support for those portions of Velez's testimony which appear to conflict with Dr. Goccia's opinion.  See id. at 645 (opining that Velez can only "[o]ccasionally" lift or carry up to ten pounds, but not more); id. at 646 (opining that Velez can only "[o]ccasionally" grab, turn, or twist objects, or use his hands or fingers for fine manipulations).

If Dr. Khalid's opinion receives controlling weight on remand, the ALJ should reconsider the aspect of the ALJ's credibility determination that relied on Dr. Goccia's opinion.  This is because, "[w]hen a treating physician's opinion is entitled to controlling weight, the ALJ must defer to the physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions."  Ditsworth v. Colvin, 982 F. Supp. 2d 935, 945 (N.D. Iowa 2013) (citing Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005) ("The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is

---

[5] The court notes, however, that Velez's testimony that he can safely lift only about fifteen or twenty pounds, and can safely carry only about ten to fifteen pounds, see id. at 146, is not necessarily in conflict with Dr. Goccia's opinion that Velez retained full strength in all extremities, see id. at 74, because Velez's difficulties with lifting and carrying could be caused by his back problems.

capable of doing despite the impairment, and the resulting restrictions.")). For instance, where a treating physician opined that a claimant suffered from marked limitations in certain areas, a court in the Northern District of New York held that, to give the treating physician's opinion "controlling weight [ ] would result in a finding [by the ALJ] of marked limitations" in those areas. Tim v. Colvin, No. 6:12-CV-1761 (GLS) / (ESH), 2014 WL 838080, at *8 (N.D.N.Y. Mar. 4, 2014).

Here, to defer to Dr. Khalid's opinion that Velez can only "[o]ccasionally" lift or carry up to ten pounds, but not more, and can only "[o]ccasionally" grab, turn, or twist objects, or use his hands or fingers for fine manipulations, Tr. at 645–46, (1) would mean crediting Velez's testimony that he can safely lift only about fifteen or twenty pounds, and can safely carry only about ten to fifteen pounds, id. at 147, and (2) could provide some, albeit limited, support for Velez's testimony that he cannot use his left hand for fine motor tasks, nor to grasp an object, id. at 148–49, 155. On remand, the SSA should thus reconsider the portion of its credibility determination that relied on Dr. Goccia's opinion.

**VI.     CONCLUSION**

For the foregoing reasons, Velez's Motion for Judgment on the Pleadings (Doc.

No. 16) is **GRANTED**.  Colvin's Motion to Affirm the Decision of the Commissioner

(Doc. No. 20) is **DENIED**.  The case is remanded to the agency for further proceedings

in which the ALJ weighs the evidence in a manner that is consistent with this decision,

and issues a new decision.

**SO ORDERED.**

Dated this 15th day of February, 2017, at New Haven, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge